Bertram Harnett, J.
An imposter, a careless (insurer, an auto accident in New York involving only New York parties, and a New England State perhaps more protective of its own than its neighbors, all figure in this legal tale of two States. Together they whisper of the fragility of multiple State regulation of automobile accident insurance. And, they warn of the perils of shoddy investigation by insurers upon issuance of their auto liability policies.
We add our own elements to this story by applying the law as it is applied in New York to its own people and its own happenings. In this State, rescission of auto liability insurance policies after an accident stands in high disfavor, and is generally prohibited. Certainly, where the rights of innocent auto accident victims are concerned, insurers who undertake to investigate their insureds upon issuance of auto liability policies are charged with the knowledge to which they are reasonably alerted. They cannot simply disregard danger .signs. They are bound to the reasonably discoverable events of their insurability search. In auto accident cases, insurers who, in face of investigative results which signal caution, accept premiums and let their policies continue to run, enabling their insureds to remain on the roads, must reckon with the doctrine of estoppel when they seek post-loss disclaimer of coverage.
*89 The nature of the facts and issues suggests the desirability of a prefacing outline. This framework may enable an easier view of the unfolding controversy.
I. The Facts of the Case
II. The Issue: Considering Everything, Can Liberty Mutual Disclaim?
III. Choice of Law: New York versus Massachusetts
A. What Kind of a Case is This?
1. Tort?
2. Contract?
3. Automobile Accident Reparation — Something Special?
B. Probable Conflict in State Laws
1. Area of Agreement — Compulsory Coverage Portion
2. Conflict on Cancellation of “ Optional ” Coverage
(a) Massachusetts Law
(b) New York Law
3. Possibly Even Massachusetts Might Allow Estoppel Here
C. Elements of Contact and Public Policy
1. New York’s Interest
2. Massachusetts’ Interest
3. New York’s Interest Preponderates and Its Law Governs
IV. Liberty Mutual is Estopped from Disclaiming as Against an Innocent Auto Accident Victim
A. Remedy of Auto Liability Insurance Rescission Curtailed in New York
1. Compulsory Aspect of Coverage
2. No Rescission Even Beyond the Assigned Risk and Compulsory Components
(a) Assigned Risk or Compulsory Insurance Not Divisible
(b) Massachusetts Issuance Does Not Change Result
B. Estoppel By Insurer’s Conduct
1. Effect of the Impersonation
2. Improper Investigation
3. Also Liberty Mutual Neglected to Cancel Timely
V. There is Coverage Here By Liberty Mutual.
*90 I. THE FACTS OF THE CASE
A sequence of events forms the basis of the dispute.
(a) On December 10, 1971, a man using the name “ Michael Swords ’ ’ applied at a Massachusetts public office for automobile liability coverage through that State’s motor vehicle assigned risk insurance plan. He indicated in his application that he resided in Harden City, New York, had a valid New York State operator’s license, and was a student with a Boston mailing address. He applied for liability coverage “A” on Massachusetts roads, which is made compulsory by statute there, and for optional coverage “ B ” on all roads, even outside Massachusetts, for the total sums of $10,000 for one party and $20,000 for all parties in any one accident. This is described as $10,000/$20,000. The sums applied for were twice the minimum limits required on Massachusetts roads.
(b) The insurance application was approved by the State motor vehicle office with the coverage then bound and was forwarded to Liberty Mutual Insurance Company (Liberty), which accepted the cash premium collected. On January 19, 1972, Liberty issued a policy with the full requested $10,000/$20,000 coverage, effective for 20 days, covering the period from December 10, 1971 to January 1, 1972. No investigation report or verification of the information given on the application had been received in the 40 days between application approval and policy issuance.
(e) In January, 1972, Liberty undertook to investigate its applicant through the Beacon Underwriting Service. Beacon reported to Liberty, in writing, on January 21, 1972: “We attempted to interview assured at above Beacon St. address, however, we were unable to locate him there. Assured’s name does not appear on any mailbox or bell at this address. We spoke to a neighbor who thinks that assured lived here at one time but has since moved. The assured left no forwarding address and we have no means of establishing his whereabouts. Assured is a student but it is not known where he attends. The assured has an out-of-state license. We find no local records on file for him. We are unable to determine is [sic] the assured still has this 1966 Chevrolet in his possession”.
As Liberty’s underwriter testified the purpose of this report was: “basically verifying the records, Motor Vehicle records of the insured, verification of the residential garaging, type of vehicle driver, moral standards, character, et cetera ’ ’.
(d) Liberty sent a questionnaire to its applicant in January, 1972 seeking to elicit information on which to generate a *91 policy, as part of its post-issuance underwriting procedure. There was never any response to the questionnaire.
(e) According to the Liberty underwriter, the carrier attaches significance to its post-issuance investigatory efforts. His testimony was, in part:
“ Q Do I understand it correctly that you relied enough on the December, ’71 application so that you, in fact, investigated those statements?
A We write and attempt to verify and establish information as rendered on the application, nothing more. .
Q We are playing with semantics. Did you check the application?
A Yes, sir, right.
Q So you didn’t accept the application at face value?
A That’s correct.
Q So you didn’t reply on it as it was given to you, fair statement?
A No, again we checked the information.
Q That’s right, you did not reply on it, you went out and checked it?
A Yes.”.
(f) Liberty made no inquiries at the Garden City home address given by the applicant. Liberty made no inquiries of the New York State Motor Vehicle Department.
(g) On March 8, 1972, a policy for the year 1972 was issued retroactive to January 1, 1972. No new application was made for this renewal policy.
(h) On September 23, 1972, the applicant and his automobile (accurately described as to make and model in the insurance papers) became involved in an auto accident in Long Beach, New York. The injured driver of the other car, David Sullam, of Long Beach, later sued the applicant for personal injuries.
(i) The applicant telephoned to Liberty a report of the accident. In the ensuing claim investigation, Liberty learned that the applicant was in reality named Walter Leydet, formerly of Garden City, but now of Long Beach, and that he was not Swords at all. Moreover, Leydet had no valid New York Sate driver’s license. However, the car, while improperly registered in Swords’ name, along with the insurance, actually did belong to Leydet.
(j) Liberty then disclaimed liability on the ground of fraud and misrepresentation by Leydet in procuring his policies in in the name of Swords, both for the short 1971 period and for 1972.
(k) Liberty refunded the premiums for both periods on November 11, 1972, almost two months after the accident.
*92 II. THE ISSUE: CONSIDERING EVERYTHING, CAN LIBERTY MUTUAL DISCLAIM ?
Allstate Insurance Co. is the auto insurer for Sullam, the injured party. Since Liberty disclaimed, Sullam sought to charge Allstate under the uninsured motorist endorsement of his own policy. Allstate resists this charge, claiming there is coverage here, namely by Liberty. It attacks, by this petition for declaratory judgment, the validity of Liberty’s disclaimer.
Mr. Sullam, holding a personal injury claim, which from all pretrial conferential indications is modest (even within the financial limits described in Liberty Mutual coverage A), is caught in the cross fire between the two warring titans of insurance finance. He can only watch the timely recompense to which he may be entitled become continually eroded by litigious delay and the expense of hanging in there. The unfairness of this position has been commented upon by this court in a previous decision (cf. Brown v. Reid, 72 Misc 2d 237), in which there was discussed the desirability of some procedure in which disputing carriers should be obliged to clear the claim of an innocent victim before fighting the matter out at length between themselves.
By memorandum decision dated March 5, 1973, and order dated March 14, 1973, Mr. Justice Suozzi set the matter down for a hearing and determination on two issues, first, whether Liberty was deceived by Leydet’s giving a false name and address, and, second, whether its disclaimer for fraud was valid.
m. CHOICE OF LAW: NEW YORK VERSUS MASSACHUSETTS
Which law is to apply: New York or Massachusetts?
We conclude that the law of New York must prevail, for two general reasons. First, upon massing the contacts, it is clear that the issue has most pertinent and profound effect in New York. Second, Massachusetts law, to the extent that, it fails to accord the same panoply of protection from tardy insurance cancellations for out-of-State victims of Massachusetts driver negligence as it does for its own resident victims, is offensive to New York’s public policy and should not be enforced here.
A. WHAT KIND OF A CASE IS THIS?
Bight at the threshold we are confronted with intricate problems of the subject known as “ Conflict of Laws ”. The opening move is to look to the governing conflict of laws doc *93 trine of the “forum” State, which is New York, where the case is being heard. (Magnolia Petroleum Co. v. Hunt, 320 U. S. 430, 440.)
1. TORT?
The traditional New York conflicts rule in a tort or accident case is that the law of the place of the accident governs. But, this rule has been recently modified in favor of the more flexible principle that the law of the State with “ greatest concern with, or interest in, the specific issue raised in the litigation” governs. (Neumeier v. Kuehner, 31 N Y 2d 121, 127; Looker v. Lopez, 24 N Y 2d 569; Babcock v. Jackson, 12 N Y 2d 473.)
2. CONTRACT?
On the other hand, an insurance policy is a contract. If this is simply a contract case, the modern rule is that the law of the State having the most significant relationship to the transaction will be applied to resolve issues of essential validity of the contract, absent some manifest offense to the public policy of the forum State. (Goodrich •& Scoles, Conflict of Laws [4th ed.] 212); Employers’ Liab. Assur. Corp. v. Aresty, 11 A D 2d 331, affd. 11 N Y 2d 696; cf. Oltarsh v. Aetna Ins. Co., 15 N Y 2d 111.)
It would seem clear enough here that a material misrepresentation, in the form of a deliberate impersonation to induce a policy issue, was made in December, 1971. However, right after that, significant events took place in the form of investigative conduct and premium retention by Liberty, and, then, the intervening rights of a third party, injured in an accident with an automobile whose continued use was facilitated by Liberty. In cases governing performance of a contract and waiver and estoppel, we must return with even greater emphasis to substantial relationships. These include State interest and policy, place and manner of performance, and the various State contacts. (See Intercontinental Planning v. Daystrom, Inc., 24 N Y 2d 372; Crisafulli v. Childs, 33 A D 2d 293.)
Moreover, the recognition and application of another State’s law in the forum State is a matter of comity, of discretionary obligation, and neighborly courtesy. But, where a legal doctrine of another State is offensive to the policy of New York, or is unduly discriminatory in favor of that State’s own residents, under familiar conflict of laws principles, New York need not follow that other State’s doctrine. (See Hughes v. Fetter, 341 U. S. 609, 611; Coster v. Coster, 289 N. Y. 438.)
*94 3. AUTOMOBILE ACCIDENT REPARATION-SOMETHING SPECIAL?
At the risk of beating a dead horse, one further observation may be chanced. This case is not strictly in tort, and not strictly in contract. It is in both — and neither.
Automobile accident reparation is something special, born of a distinct and enlarging social need. It depends upon a specific public interest in policing roads and streets, and in making provision for injuries sustained in automobile accidents. Increasing amounts of interstate travel produce fortuitous and often complex legal entanglements. Issues of accident recompense are resolved, less by reference to technical rules of happenstance, more by ascertaining the nature and depth of each locality’s relation to the injuries and to the manifest policies of insurance coverage and conduct. We turn then to examine the precise issue of conflict here and each State’s policy relation to that issue.
B. PROBABLE CONFLICT IN STATE LAWS
If the law of both States is the same, there is no conflicts problem. But, there seems to be one.
1. AREA OF AGREEMENT-COMPULSORY COVERAGE PORTION
In some general respects, the laws of New York and Massachusetts are not in conflict. In adjudging the impact of a material misrepresentation made on ordinary insurance application forms, both States may permit rescission. (New York Insurance Law, § 149; Mass. Gen. Laws, eh. 175, § 186.) More to the point, both jurisdictions employ a doctrine of estoppel which may bar an insurer’s attempts to rescind retroactively compulsory automobile liability coverage. Such insurance is “ compulsory ” in the sense that State law requires it in minimal dollar amounts for each registered vehicle. Operating a car without the mandatory minimum coverage or registration is a criminal offense.
The Supreme Judicial Court of Massachusetts held in Canavan v. Hanover Ins. Co. (356 Mass. 88, 91), where a notice of cancellation, mailed to an improper address furnished by the ■insured, was not received by him, and he struck a pedestrian five days after the effective date of cancellation: 1 ‘ The notice of cancellation may have been effective. There was, however, an estoppel. The contention to the contrary overlooks the fact that the purpose of the compulsory motor vehicle law is the protection of the traveler on the public ways by providing com *95 pensation to persons injured through the operation of an automobile insured by the owner.”
The reason the insurer there was held liable, however, was because the pertinent coverage was compulsory. Indeed, the Liberty policy here incorporated this principle under Part I, “ Coverage A ”, which expressly states that “No statement made by the insured * * * .shall operate to defeat or avoid this coverage so as to bar recovery by ” an injured third party seeking to collect on a judgment against the insured. Both Massachusetts and New York agree on this principle. (See Teeter v. Allstate Ins. Co., 9 A D 2d 176, affd. 9 N Y 2d 655.) (Compare Greenberg v. Flaherty, 306 Mass. 95, and Wheeler v. O’Connell, 297 Mass. 549; with Aetna Cas. & Sur. Co. v. O’Connor, 8 N Y 2d 359.)
2. CONFLICT ON CANCELLATION OF ‘ ‘ OPTIONAL ’ ’ COVEBAGE
The interstate rub comes from the fact that the accident happened in New York and the Massachusetts’ definition of compulsory automobile liability coverage extends only to accidents occurring within the Commonwealth. The question then becomes whether rescission is still prohibited and whether estoppel may operate so as to bar disclaimer of coverage beyond the compulsory minima.
(a) MASSACHUSETTS LAW
Section 34A of chapter 90 of the Massachusetts General Laws defines “Motor vehicle liability policy” to cover liability for “ damages * * * arising out of the ownership, operation, maintenance, control or use of such [insured] motor vehicle upon the ways of the commonwealth”. (Emphasis supplied.) This provision has been interpreted to exclude from compulsory coverage any liability attaching from an out-of-State accident. (Sleeper v. Massachusetts Bonding & Ins. Co., 283 Mass. 511.) There is “ optional ” liability coverage available beyond the compulsory minimum, such as the extraterritorial aspect of “ B ” coverage here.
The rule in Massachusetts for rescission of “optional” insurance coverage, which lacks the legislative “compulsory” imprimatur protecting third-party victims, seems more stringent. Historically, it appears to be that where optional insurance is involved, the carrier may assert any defense against the injured third party that might be raised against the insured.
The leading case for this rule is Cassidy v. Liberty Mut. Ins. Co. (338 Mass. 139), where an injured guest was held barred from recovering from the insurer because of a misrepresenta *96 tion by the insured that he owned the covered automobile. The court said that the insurer’s defense of fraud would not be available where compulsory coverage is involved, but guest coverage is optional in Massachusetts. It held that if the injured party seeks to reach noncompulsory insurance proceeds, “ any defense available to the insurer against the insured is also available against the plaintiff”.
In Massachusetts then, since Leydet personally would likely be barred by his falsification in any- direct action between him and Liberty, so would Mr. Sullam. Under the Cassidy doctrine, Mr. Sullam would not be protected by estoppel. This is so only because the accident occurred in New York under the optional “B” coverage, and not in Massachusetts. (See Salonen v. Paanenen, 320 Mass. 568; cf. Fallon v. Mains, 302 Mass. 166.)
(b) NEW YORK LAW
The law of New York, in contrast, defines compulsory automobile insurance to cover bodily injury liability arising out of accidents -anywhere in the United States or Canada. (See, infra, p. 99.) Applying its estoppel doctrine, New York makes no distinction based upon accident location, since compulsory coverage here includes both in and out-of-State occurrences. (See Aetna Cas. & Sur. Co. v. O’Connor, 8 N Y 2d 359, supra; Insurance Law, § 310.) Estoppel of policy rescission is then available irrespective of accident locus. (Cf. Rescission or avoidance, for fraud or misrepresentation, of compulsory financial responsibility or assigned risk automobile insurance, 83 ALR 2d 1104.)
As stated in the concurring opinion in Simpson v. Loehmann (21 N Y 2d 305, 313): “ This court has on a number of occasions given effect to the -strong State interest in facilitating recovery of persons injured in automobile accidents. The fact that the injury occurs outside of this State does not, of course, lessen that interest ’ ’.
3. EVEN MASSACHUSETTS MIGHT ALLOW ESTOPPEL HERE
In fairness to Massachusetts, it may be that it is moving away from the Cassidy rule and permitting estoppel in appropriate cases against insurers where public auto accident victims are concerned. If this is so, no conflict may exist, and a conflicts of law di-scussion may be a moot scholastic exercise.
Estoppel is essentially a judicially created 'equitable doctrine designed to avoid an unfair or harsh result. The cited Massachusetts cases under Cassidy permitting rescission -of *97 * ‘ optional ’ ’ auto liability coverage have not been overruled. But, there have been some recent statutory charges in Massachusetts which bear upon the continued vitality of those cases.
In 1968 the Massachusetts Legislature amended section 1130 of chapter 175 of the Massachusetts General Laws (Stat. 1968, ch. 643, § 3) by adding a provision, providing that no insurance company shall issue a compulsory automobile liability policy ‘ ‘ unless it agrees to issue to [the insured] at his option, additional coverage, beyond that required by [the compulsory insurance statute] of bodily injury liability off the ways of the commonwealth”. In 1970, the statute was again amended to require, as it does today, each company issuing a compulsory policy to make “a mandatory offer to issue”, at the option of the insurer, additional coverage including extraterritorial liability. These changes 'indicate a legislative policy to encourage the purchase of the “ optional ” liability coverage, logically for the same public policy reason that the compulsory insurance is mandated. (See, also, Mass. Gen. Laws, ch. 175, § 113H.)
A reflection of this State policy is the application form signed here. It .specifically mentions B coverage as an optional entitlement and states in capital letters immediately above the signature line that the applicant ‘ ‘ further understands that the MASSACHUSETTS INSURANCE DEPARTMENT STRONGLY RECOMMENDS THAT I PURCHASE ALL OF THE COVERAGE I AM ENTITLED TO FROM THE COMPANY PROVIDING [His] COMPULSORY COVERAGE ”.
There is no longer legislative indifference to “optional” coverage. The compulsory liability insurer is required by statute to offer extraterritorial coverage, although the insured is not required to accept and pay for it. Where he does opt for the extra coverage, the company must provide it. (Insurance Rate Bd. v. Commissioner of Insurance, 356 Mass. 184.) Here, then, is a legislative concern evidenced for optionally covered automobile accident victims, as in accidents outside Massachusetts. Although no case has yet so held, there seems a burgeoning basis for abandoning the Cassidy doctrine as to optional coverage required to be offered by section 1130 of chapter 175 of the Massachusetts General Laws. If so, the estoppel available to accident victims where compulsory insurance is involved might well be extended to accident victims where the now legislatively favored “optional” coverage is present. Then, New York and Massachusetts law would coincide and there would be no conflict.
*98 A provision in Liberty’s policy here regarding cancellation of optional coverage tends to support this conclusion. “ The company shall not exercise its right to cancel any coverage available to the insured at his option pursuant to Section 1130 of Chapter 175 of the General Law of Massachusetts to take effect at a date earlier than the termination of coverage A.”
Since, under the Canavan doctrine, estoppel is available to protect accident victims from retroactive cancellation of compulsory coverage, it may well be that this contract provision would also keep the optional coverage in effect during the prior period when that estoppel was operative. However, whether this clause is purely procedural, or whether it evidences an intent to tie together the validity of the coverages, is still unresolved in Massachusetts.
On the other hand, there have been cases decided since section 113C of chapter 175 of the Massachusetts General Laws was amended, which still refer to “B” coverage as “ Optional ”, Aetna Cas. & Sur. Co. v. Commissioner of Insurance, 358 Mass. 272, 279, and cite the Cassidy rule as being effective, Lombardi v. Lumberman’s Mut. Cas. Co. (-Mass. -, 280 N. E. 2d 149), although the thoughts raised here have not yet been specifically discussed. In any event, extraterritorial liability coverage, while encouraged, is still noncompulsory in Massachusetts.
In sum, there are material indications that the Massachusetts law is changing with respect to estoppel in cases involving optional insurance. However, in the absence of more definitive authority, this court will proceed under the assumption that Cassidy is still the law in that State, and conflicts directly with the cited New York estoppel cases and .settled State policy.
0. ELEMENTS OE CONTACT AND PUBLIC POLICY
We look then to the policy bases underlying each State’s rule.
1. new York’s interest
The New York interests in the rescission and estoppel issues are several. New York is the residence of both drivers in the •accident. The passengers in the Sullam car, also accident victims, live in New York. And, the accident occurred in New York.
New York has a substantial interest in the compensation of its own citizens and more precisely in protecting them from unwarranted withdrawal of liability insurance after the damage is done. It has a ‘' legitimate interest in safeguarding the *99 rights of any persons injured within its borders (Oltarsh v. Aetna Ins. Co., 15 N Y 2d 111, 117.) The prevention of unjust denial of compensation for injuries is a natural interest for New York which must look after the victims of accidents here, likely, as they are here, to be local residents, to insure payment of local hospitals and doctors, Bray v. Cox (39 A D 2d 299), to protect automobile accident victims from financially crippling medical expenses. (See Watson v. Employers Liab. Corp., 348 U. S. 66, 72; Rosenthal v. Warren, 475 F. 2d 438.) (See, Note, 74 Harvard L. Rev. 357, 379.) These interests are most directly affected by auto liability policy rescission and post-accident estoppel.
The New York policy is expressed in strong terms by the Legislature: “ The legislature is concerned over the rising toll of motor vehicle accidents and the suffering and loss thereby inflicted. The legislature determines that it is a matter of grave concern that motorists shall be financially able to respond in damages for their negligent acts, so that innocent victims of motor vehicle accidents may be recompensed for the injury and financial loss inflicted upon them. The legislature finds and declares that the public interest can best be served in satisfying the insurance requirements of this article by private enterprise operating in a competitive market to provide proof of financial security through the methods prescribed here.” (Vehicle and Traffic Law, § 310, subd. [2].)
The concern for "innocent victims of motor vehicle accidents ” is. not confined within the boundaries of New York State. There is no distinction for or discrimination against out-of-State accidents. (See Tooker v. Lopez, 24 N Y 2d 569, 577, supra.) On the contrary, the liability insurance required by statute for each New York automobile owner is a minimum of $10,000 per person and $20,000 per accident to cover: “ against loss from the liability imposed by law for damages, including damages for care and loss of services, because of bodily injury to or death of any person and injury to or destruction of property arising out of the ownership, maintenance, use, or operation of a specific motor vehicle or motor vehicles within the State of New York, or elsewhere in the United States in North America or the Dominion of Canada ”. (Vehicle and Traffic Law, § 311, subd. 4, par. [a].) (Emphasis supplied.)
Moreover, the Legislature has recently enacted legislation reflecting New York’s profound concern with liability insurance contained in policies issued out-of-State to cover automo *100 biles driven in New York. (See L. 1973, ch. 13, § 1 enacting Insurance Law, § 676, effective Feb. 1, 1974, discussed, infra, pp. 103-104.) Interestingly, it was “ 10/20 ” coverage that the insured here opted to buy from Liberty, effective anywhere the automobile was driven.
2. MASSACHUSETTS’ INTEREST
The reason for Massachusetts limiting compulsory insurance to in-State accidents seems largely a monetary one. It costs carriers less to provide such coverage and, therefore, the premiums can be lower. A rather distasteful rationale for this chosen priority of accident victim compensation may be inferred since the compulsory aspect of liability coverage should derive from concern for the victim. Has Massachusetts really decided that persons injured in accidents outside its boundaries, likely not to be residents of the Bay State, are less worthy of protection than those injured by in-State accidents, at least to the extent of the compulsory coverageÍ (Cf. Brown v. Great. Amer. Ind. Co., 298 Mass. 101; Desmarais v. Standard Acc. Ins. Co., 331 Mass. 199.) It seems inconsistent with the progressive philosophy of a State which has pioneered in the field of automobile accident victim coverage, being the first in the United States to enact both compulsory automobile insurance, in 1925, and a no-fault system, in 1970. (See Mass. Gen. Laws, ch. 90, §§ 1A-34A; No-Fault in Massachusetts, Chapter 670, Acts of 1970, A Synopsis and Analysis, 55 Mass. L. Q. No. 1, p. 23.)
The Massachusetts statute with extraterritorial exclusion implicit in its definition of compulsory automobile insurance was enacted in 1925. At that time, the volume, speed, and range of automobile traffic was miniscule compared with today. Whatever the exclusion’s rationale was initially, it is likely to have decreased with time and now appears to have no independent policy justification in an era of vast interstate highways crisscrossing the country, of high-powered, fast automobiles capable of propelling tons of metal at deadly velocities, and increasing leisure-vacation-travel time for a more affluent, cosmopolitan, and mobile society.
It can only be argued here for Massachusetts’ concern, that it has an interest in the certainty of insurance contracts entered into in its State. However, that is not an exclusive realism. While Liberty does have its home office in Boston, Massachusetts, this does not reflect just a Massachusetts’ interest. Today, *101 most insurance companies are national in reach and operation. Liberty is no exception, being licensed in many States, including New York, to sell insurance. In fact, its own policy in this case states that it “ has more than 175 service offices throughout the United States and Canada”. Doubtless, Liberty has "countless more insureds outside of Massachusetts than inside that State. The interest in protecting against fraudulent applications is therefore shared by all States for any of the companies locally licensed by it.
Here, the most pertinent interest is in expedition of investigating and cancelling risks. In this way, protection of the public is made more certain, and persons who will not be insured will be quickly removed from the road. In general, this interest in shaping the conduct of insurance business is shared by all States, but in this case, where all the involved parties are New Yorkers, involved in an accident in New York, the concern is particularly localized.
Surely, it could not be suggested that added investigation would add to the cost of Massachusetts residents and that this should be subsidized by other States.
3. new York’s interest preponderates and. its law governs
In conclusion, the court believes that application of the Massachusetts rule, assuming it to bar entirely estoppel of an insurer for lack of diligence in cancellation of coverage for out-of-State accidents ‘ ‘ would defeat a legitimate interest of the forum .State without serving a legitimate interest of any other State ”. (Intercontinental Planning v. Daystrom, Inc., 24 N Y 2d 373, 385, supra.) The .strong policy of New York to compensate accident victims regardless of where hurt, and to curb dilatory insurer activity, as contacted here through a total New York accident .scene and participation, “is superior ”. To the extent there is a conflict, New York law applies. (See Pahmer v. Hertz Corp., 36 A D 2d 252.)
New York has a real and overriding interest in protecting “its own residents * * * against unfair or anachronistic statutes ” of other States. (Neumeier v. Kuehner, 31 N Y 2d 121, 125.) The abandonment of an otherwise viable insurance liability protection for traveling motorists purely because the accident occurred outside Massachusetts might be described, not unreasonably, in those terms.
It is common knowledge that commercial and private vehicles constantly flow between the States and indeed here, the probability of substantial driving in New York State was sig *102 naled by the fact that the insured presented a New York operator’s license and declared himself a student in Boston with a Garden City, New York residence. Even the ostensible place where a car is garaged, here, purportedly Boston, is not determinative, especially where there is the sociomobility suggested by the given New York residential address. (Restatement, 2d, Conflicts, § 193; Haines v. Mid-Century Ins. Co., 47 Wis. 2d 442.) If the use of Massachusetts law is to eradicate the defense of estoppel on the ground that there was no compulsory coverage purely because the accident occurred outside Massachusetts, it is indeed inimical to New York State’s interests. It is made even more ,so by the realization that an accident in Massachusetts likely involving Massachusetts residents would invoke no such a recovery bar, at least to the compulsory level. Why should damages for injuries suffered in New York accidents be any less recoverable?
The anomaly here is no less .so simple because New York has enacted a back-up uninsured motorists endorsement law, also tp protect innocent accident victims: This is part of the cost structure of New York insurance. That pool is available only where no other coverage exists. ' It is not intended to be a sop for insurance risks dumped ¡on New York by its neighbors. (See Teeter v. Allstate Ins. Co., 9 A D 2d 176, 184, affd. 9 N Y 2d 655.)
Fairness in honoring the parties’ expectation is another consideration. Yet, the expectation of the parties here hardly tends towards Massachusetts law since there was no specification in the policy -of what law .should apply. Moreover, there was material indication on the completed application form of risks to be incurred in the residential State of the applicant, New York. (Miller v. Miller, 22 N Y 2d 12, 21.) Indeed, the selection of the optional coverage “B” confirms an out-of-State expectation.
W. LIBERTY MUTUAL IS ESTOPPED- PROM DISCLAIMING AS AGAINST AN INNOCENT AUTO ACCIDENT VICTIM
Liberty is barred from disclaiming by two fundamental principles of New York insurance law. First, the appearance that automobile liability coverage may not be rescinded retroactively where the recovery rights -of an injured third party would -suffer. Alternatively, Liberty’s failure to investigate and heed clear-cut warnings of application misstatements effectively estops it now from using those misstatements to void the policy.
*103 A. REMEDY OP AUTO LIABILITY INSURANCE RESCISSION CURTAILED IN NEW YORK
There is a general rule in New York which opposes rescission of automobile liability policies. It has been recently east in broad terms: “As a matter of public policy, an insurance carrier cannot rescind automobile insurance ab initio ”. (State Farm Mut. Auto. Ins. Co. v. Carrion, 41 A D 2d 708.)
1. COMPULSORY ASPECT OP COVERAGE
The rule was first and most definitively expressed in Aetna Cas. & Sur. Co. v. O’Connor (8 N Y 2d 359, supra) in a case involving auto liability insurance provided under the assigned risk plan. Both New York and Massachusetts operate such plans by which drivers unable to obtain liability coverage are given it at a higher premium by random assignment to one of a pool of carriers. In O’Connor, the court found that the carrier’s only remedy for discovered fraudan an assigned risk policy is prospective cancellation of the policy according to the plan’s prescribed statutory procedures. Shortly after the O’Connor decision, Teeter v. Allstate Ins. Co. (9 A D 2d 176, affd. 9 N Y 2d 655, supra) held that an automobile liability policy issued in New York at a time when auto liability insurance was compulsory could only be canceled prospectively according to statutory procedures with notice and an opportunity to be heard, and not in any event retroactively. (See, also, Aetna Cas. & Sur. Co. v. Garrett, 31 A D 2d 710.)
In our .own case, we have a mixture of assigned risk and compulsory insurance. Here, the coverage extended was via the Massachusetts assigned risk plan. Conference discussions indicated that the amount of the claim is well within the compulsory dollar minima .set in Massachusetts.. There is a compulsory component to the assigned risk policy here, both territorially and in minimum: coverage limits, with its own statutory prospective cancellation procedures. As pointed out earlier, the policy itself ties the optional portion of the policy to the compulsory portion for purposes of cancellation procedure. Even though the policy is a Massachusetts assigned risk, there are sufficient compulsory and public ingredients to the coverage here to bar any rescission ab initio.
Interestingly, under New York’s new “ Comprehensive Automobile Insurance Reparations Act,” (L. 1973, ch. 13, § 1), also known as its “No-Fault” plan, to become effective February 1, 1974, this controversy would probably be resolved quickly against Liberty by .statute. The act .specifically requires *104 every insurer authorized to do, or doing, business in New York to include in any motor vehicle liability insurance policy issued in any State, covering a car used in New York, the minimum compulsory coverage required by the New York State Insurance Law; and, “ every such policy shall be construed as if such coverage were embodied therein (Insurance Law, § 676, L. 1973, ch. 13, § 1.) Hence, under the new statute, the policy issued here to a New York resident would “be construed ” to include New York’s compulsory $10,000/$20,000 liability coverage, nonrescindable under the cited governing authorities.
2. NO RESCISSION EVEN BEYOND THE ASSIGNED RISK AND COMPULSORY COMPONENTS
That the coverage invoked here is technically “optional” in Massachusetts does not wipe out the bar against rescission.
(a) ASSIGNED RISK OR COMPULSORY INSURANCE NOT DIVISIBLE
In New York, the minimum compulsion is to have a policy of at least $10,000/$20,000, covering occurrences both inside and outside the State. Massachusetts has two compulsory components, $5,000/$10,000 coverage limits, and that only for occurrences within Massachusetts. In these .senses, policies of auto liability insurance may have optional or elective features, in addition to the compulsory minimum requirement. Assuming rescission cannot be had as to the compulsory minimum amounts in New York, is it nevertheless available to the elective sums of coverage in excess of the law’s minimum requirement?
We believe that in the scheme of compulsory automobile liability insurance, the policies are not divisible for rescission purposes. Even beyond the elements of compulsory component and the existence of assigned risk policies, we find that in New York an auto liability policy is not retroactively rescindable. This is because of the resulting prejudice to the accident victims seeking recompense for injury. They are third-party beneficiaries of the liability policy contract between the insured and the insurer. Once added liability coverage is purchased and bound, the same policy prohibitions protect against rescission. Nothing in the forms standardly used in New York, or the policy form in this case, or in the statutes, .suggest such artificial divisions within one indivisibly stated policy.
This full application of the O’Connor-Teeter rule is signaled in Reliance Ins. Co. v. Daly (38 AD 2d 715). There, the insured fraudulently misrepresented his driving record in applying and *105 securing auto liability insurance of $300,000 for each accident victim, $290,000 in excess of compulsory minimum coverage. The Appellate Division, Second Department, unanimously upheld the lower court’s dismissal of the carrier’s action to rescind the excess dollar amounts of the policy over the $10,000 minimum compulsory coverage, and in so doing, expressly applied the Teeter rule against retroactive rescission to optional or elective coverage. The broad language cited above in State Farm Mut. Auto. Ins. Co. v. Carrion (41 A D 2d 708, supra) likewise appears to subject all “ automobile insurance ” to the Teeter doctrine.
The case here is a peculiar one in the sense that the coverage the .applicant elected for his car operation was beyond the Massachusetts territorial compulsion; yet, in New York, he met the exact compulsory limits voluntarily. He elected to carry the New York minimum insurance anyway. In light of the New York authorities discussed, Reliance Ins. Co. v. Daly, supra; Aetna Ins. Co. v. O’Connor, 8 N Y 2d 359, supra, it would be sheer judicial flippancy to discard here the rights of an innocent third-party accident victim where the carrier, for a premium, armed his antagonist. While not originally electing to deal with the applicant under the Massachusetts compulsory plan, via verification procedures and premium retention, it chose to keep dealing with that applicant whoever and wherever he was. In a sense, it became the applicant’s backer, and it must look for its redress to the one it chose to continue dealing with. Reliance itself underscores this avenue of relief in holding that the carrier may sue the fraudulent applicant for its damages resulting from the extension of nonrescindable coverage.
(b) MASSACHUSETTS ISSUANCE DOES NOT CHANGE RESULT
It may be argued that the rule against auto liability insurance rescission in New York is so closely tied to the New York statutory prospective cancellation procedures that it has no application to a policy issued in Massachusetts under a different statutory scheme. However, the United States Supreme Court has said, in permitting a Louisiana suit directly against a carrier on a Massachusetts issued policy prohibiting such suit: ‘ ‘ More states than one may seize hold of local activities which are part of multistate transactions and may regulate to protect interests of its own people, even though other phases of the same transactions might justify regulatory legislation in other states.” (Watson v. Employers Liab. Corp., 348 U. S. 66, 72, supra.)
*106 B. ESTOPPEL BY INSURER’S CONDUCT
Even .apart from the question of rescission, the conduct of the carrier bears upon its capacity to negate the coverage extended.
1. EFFECT OF THE IMPERSONATION
The more pertinent argument for Liberty’s disclaimer is the impersonation by Leydet of Swords. Leydet was an imposter, and under conventional “fraud in the inception” authority, Liberty may try to stand with the position that no legal relationship ever existed between it and Leydet. (See Telford v. Metropolitan Life Ins. Co., 223 App. Div. 175, affd. 250 N. Y. 528; Restatement of Contracts, § 475, Illustrations 5, 7; cf. Illustration 6.)
But, even that event must fail Liberty in the final .analysis. Even -if all of the court’s prior analysis is overborne by the fraud factor, Liberty must still' fail. And, this is for one bottom line reason; Liberty failed in its own investigating and continued insuring conduct.
Where no legal relationship may have originally existed, Liberty intorduced one. (See 20 N. Y. Jur., Equity, § 56.)
2. IMPROPER INVESTIGATION
Writing automobile liability insurance is a, serious responsibility fraught with public interest. It is so because of its integral relationship to the dangers of highway travel, injuries inflicted on byway users and the staggering costs of recompense and resulting carrier exposure.
Yet, it is startingly easy to apply for and obtain liability insurance because driving is considered so essential that the required coverage is made readily available. The undertaking of risks, and placement of drivers on the road, is accomplished through use of simple forms and computers. Often, as here, or with insurance agents and brokers, there is never a face-to-face meeting of the insurer and insured. Filled-in blanks suffice for initial coverage. And, since fraud is one basis for cancelling coverage initially extended, the discovery of fraud by complete investigation is critical. This is so particularly with an assigned risk policy which by nature involves more risks than the ordinary liability policy and puts insurers on notice to be vigilant for special problems. Chief Judge Fuld in O’Connor (8 N Y 2d 359, 364-365, supra) made this very point in stating: “ That there is no right to rescind the .assigned risk policy does not mean that the carrier is deprived of all reason *107 able redress against the insured who misrepresents material facts in order to obtain coverage, since the Plan expressly provides for cancellation under these circumstances. The effect of the Plan is to enforce upon the insurer the necessity to discover fraud at the earliest possible moment, before an accident occurs and the rights of innocent injured third parties have intervened. In this respect, the Plan merely reflects the oft-repeated legislative recognition that liability insurance is not the concern solely of the insured and his insurer. * * *
‘ ‘ Aetna did, in this case, actually conduct an early investigation of O’Connor and, if that investigation had been performed properly, the insured’s misrepresentation would have been discovered and Aetna could have cancelled, pursuant to section 18 of the Plan, long before the Hamiltons were injured. "While, therefore, Aetna may ultimately be held on a policy obtained by fraud, its liability is in a very real sense attributable to its own fault, and the true beneficiary is not the wrongdoer, but his innocent victims ”.
There is, then, a duty of the carrier to investigate thoroughly to verify the information supplied by the applicant. The Supreme Court of California has held: “We conclude that an automobile liability insurer must undertake a reasonable investigation of the insured’s insurability within a reasonable period of time from the acceptance of the application and the issuance of a policy. This duty directly inures to the benefit of third pérsons injured by the insured. (Barrera v. State Farm Mut. Auto. Ins. Co., 71 Cal. 2d 659, 663.)
The logical corollary of the duty to investigate is to bar the insurer from raising any facts of noninsurability which were discoverable upon reasonable inquiry. The Supreme Court of Utah succinctly characterizes this principle: " An insurer cannot neglect its duty to make a reasonable investigation of insurability or postpone its investigation until it learns of a probable claim and still retain its right to rescind ”. (State Farm Mut. Auto. Ins. Co. v. Wood, 25 Utah 2d 427, 429.)
Liberty’s investigation here was thoroughly shoddy. In the first place, a policy was issued on January 19, 1972, 40 days after the initial application was made, without any intervening .verification of the applicant’s statements. It appears, in fact, that Liberty had ordered an investigation made but did not bother to await its results before issuing the policy. Such procedures may be mechanistically explainable, but they are hardly prudent.
*108 Then, in both questionnaire mailing and agency investigation, the company failed to follow up on obvious points of discrepancy. It had two significant indications that all was not well. The Beacon Underwriting Service on which it relied for verification of such things as garaging, moral standards, and character, was so blank as to be patently suspicious. Aside from one vague reference of a neighbor ‘' who thinks that assured lived here at one time ”, there was absolutely no indication of any “ Michael Swords”. Scarcely more than a month after the application was filled out, the investigation disclosed that the insured was not at the stated address, left no forwarding address, and could not be located. There was no factual reason to suppose the applicant had a genuine Boston address, that he was a student, or that he was genuine in any way. During that same period, the post-issuance underwriting questionnaire was mailed, it was never executed. It was returned, unanswered, from the Boston mailing address.
Liberty never went to the Garden City address (see Allstate Ins. Co. v. Dorr, 411 F. 2d 198), nor did it inquire of the New York State Motor Vehicle Department. It never secured the name of the .school the applicant was supposedly attending in the Boston area.
If it had pursued any of these obvious investigatory avenues, the fraud would have been discovered in short order. It was reasonably discoverable in advance of the accident. The speed and ease of potential discovery is confirmed by the quick uncovering of the entire circumstance once the carrier decided it was worth its while to follow up properly, after a claim for personal injury was filed. Liberty should have done better in the first place. It may not play the gambit of looking the other way from discoverable facts in clear investigatory view, and then expect to claim surprise and seek disclaimer because of those facts. The other .side of the gambit, properly assessed, is that the discoverable facts, if ignored, are then lost as a defense to a third party’s claim for injuries. After all, the shoddy investigation prevented the early discovery of fraud and cancellation, and contributed to keeping Leydet on the road up to and through the time of the accident.
3. ALSO LIBERTY MUTUAL FAILED TO CAUCEL PROMPTLY
The contradictory and inconclusive results of Liberty’s investigation were a sufficient basis for prospective cancellation of the policy. Considering the delicacy of an assigned risk liability policy issued automatically on unverified information *109 given on a form, the return of the unanswered questionnaire and highly suspicious investigation report more than offset any initial presumption of validity and regularity in the initial policy issuance. The possibility of fraud was reasonably infer-able from the lack of verification. See, e.g., Canavan v. Hanover Ins. Co. (356 Mass. 88, supra) where the carrier, having twice mailed the policy to the insured and received it back with the envelope marked “ no such [street] number ”, did heed the warning signs and, in contrast to the carrier’s conduct in this case, canceled immediately for impropriety of registration, unknown address and failure to notify the company of change of address.
Instead of acting expeditiously upon these warning signals to cancel the assigned risk coverage, Liberty proceeded to renew the initial policy on March 8,1971. (Cf. Moore v. Metropolitan Life Ins. Co., 75 Misc 2d 168.) It simply sat on the premiums tendered, for nine whole months, until an accident was reported. It thereby permitted the insured to continue driving with apparent legal liability coverage until August, 1971 when the accident took place. Having not canceled in prudent fashion, Liberty is now estopped to take advantage of the misrepresentation by denying coverage to the Sullam car victim.
There is little danger of prejudice or unfair inconvenience through immediate cancellation based upon suspicions rather than confirmed fraud. Cancellation cannot become effective until after notice and an opportunity to be heard are given. The innocent insured will, when notified, appear to clarify the inconsistencies and obtain reinstatement. The “ no-show ” of an insured after cancellation notice is sent out constitutes at least acquiescence in the cancellation if not confirmation of fraud. In this sense, the quick-fire cancellation is a prophylactic measure to sift out the uninsurables without harming others.
"Where the opportunity to cancel is bypassed, and premiums continue to be accepted, the remedy is to refuse rescission where a carrier has failed to cancel promptly upon learning of the insured’s misrepresentation. (Bernstein v. Nationwide Mut. Ins. Co., 458 F. 2d 506; see Hartford Acc. & Ind. Co. v. Breen, 2 A D 2d 271; cf. Friscia v. Safeguard Ins. Co., 57 Misc 2d 759, 762.) .
The strong emphasis placed upon protecting innocent injured parties requires that where a carrier fails to act diligently to cancel a policy after being alerted to material misrepresentations, it may be held liable for the injury and retroactive rescission predating an accident claim denied.
*110 On the basis then of Liberty’s shallow investigation and failure to cancel, its disclaimer at this late date is invalid.
V. THERE IS COVERAGE HERE BY LIBERTY MUTUAL
Accordingly, judgment is granted declaring that Liberty’s disclaimer is invalid, and that its policy is effective to cover any liablity of the insured, Walter Leydet, also known as Michael Swords, in any .action brought by the Sullam car occupants arising out of the August, 1972 accident, and directing it to defend Leydet in any such action. Arbitration of the Sullam claim against the uninsured motorist carrier, Allstate, is stayed in view of there being coverage found here. This relief is granted without prejudice to Liberty’s rights against its insured for premium refund recoupment or other relief.